RANDOLPH, Justice, for the Court:
¶ 1. Parham Pointe North, LLC (“Par-ham”) and K. Wayne Rice & Associates (“Rice”) together appeal (“the Parham appeal”), and Ballard Realty Company (“Ballard”) separately appeals, (collectively “Defendants”) a decision from the Hinds County Circuit Court awarding damages of $3,603,712 to apartment-complex tenants for loss of intellectual property and personal injuries arising from claims that the Defendants were negligent in maintaining and/or repairing a leaking pipe in their apartment. We find that the trial court abused its discretion by admitting unreliable expert testimony, allowing a lay witness to give opinion testimony, and not excluding evidence of the cost of restoration where the fair market value of the property before it was damaged was not established. We further find that the trial court abused its discretion by failing to grant a new trial on damages, as an award of lost profits without proof of past profits was not only contrary to the established law of this state, it was also contrary to the weight of evidence. Accordingly, we reverse the judgment and remand to the Hinds County Circuit Court for a new trial on damages.
FACTS AND PROCEDURAL HISTORY
¶ 2. Sometime before May 2007, Ohazu-rike notified the manager of the apartment *55 complex that there was a leaky pipe behind the toilet in the apartment where Ohazurike lived with his wife, Esther Oha-zurike (“Esther”), and their son, Darling-ton Ohazurike (“Darlington”) (collectively “the Ohazurikes”). Thereafter, on a Friday in May 2007, leaking water from the Ohazurikes’ bathroom seeped into a carpeted portion of the apartment. Water damaged nineteen “production-ready” board, card, and video games designed by Ohazurike, which were spread out on the carpeted portion of the apartment.[1] Oha-zurike testified that the complex did not send anyone to vacuum the carpet after the event, but later testified that an employee went to the apartment to dry the carpet, but failed to remove all the water from the carpet. A Parham employee and Esther both testified that one of the Defendants’ employees went to the apartment to vacuum the water, though Esther, like Ohazurike, testified that the employee was unable to remove all the water from the carpet.
¶ 3. Ohazurike testified that he had designed more than 150 board, card, and video games over a period exceeding two decades. Of these games, Ohazurike had marketed only two board games — Insight Bible Game (“Insight”) and Challenge Word Game (“Challenge”) — although fifty-three additional games were in a “production ready” state. A corporation that Oha-zurike organized, Upstart Games and Amusements (“Upstart”), sold 5,000 units each of Insight and Challenge over seven to eight years (1996-2003/2004). Aecord-ing to tax returns, Upstart never made a profit. The company reported net losses of $34,000 over a ten-year period. Ohazu-rike had created and copyrighted at least four of the nineteen “production-ready” games that were damaged in the event, more than twenty years prior to the event. Four other games were created approximately ten years before the event. Ohazu-rike offered that the reason he had not manufactured and sold any games was that he had been unsuccessful in obtaining financing, up to and including 2007. Ohazu-rike created an uber optimistic business plan, totally ignoring past losses and meager sales (actual facts and data), and then engaged Kevin Lightheart in 2006 to prepare a business valuation based on the unsupported projections of Ohazurike, to assist Ohazurike in obtaining financing to manufacture and sell games. Ohazurike’s business plan and Lightheart’s valuation were unsuccessful in obtaining financing from a single banker, lender, investor, or venture capitalist.
¶ 4. On December 11, 2007, the Ohazu-rikes first filed a complaint in the Hinds County Circuit Court, naming as defendants: Parham; Arlington Properties, Inc.; Ballard; Rice; and “agents and/or employees of the corporate defendants ....”[2]
¶ 5. In January 2008, Defendants removed the case to federal court. In July 2009, the United States District Court for the Southern District of Mississippi re *56 manded the case to state court, providing that “Plaintiff ha[d] requested and been granted leave to amend the Complaint on two occasions.... Under the current Complaint, Plaintiffs do not assert any claims arising under federal law, and the parties are not diverse.”
¶ 6. The original 2007 complaint included numerous causes of action, including allegations of racial discrimination, fraud and misrepresentation, assault, malicious prosecution, and defamation and slander. However, in excising claims to garner a remand from federal court, the Ohazurikes abandoned all claims except their claims of negligent maintenance and repair of the leak. The Ohazurikes’ second amended complaint in federal court, which prompted the remand, alleged that, due to the Defendants’ negligence, a pipe had burst in the Ohazurikes’ apartment in the Parham Pointe complex, damaging intellectual property in the form of blueprints and plans for nineteen games that Ohazurike had designed. The Ohazurikes further alleged that the Defendants’ failure to remove water from their apartment caused all three Ohazurikes to incur medical bills for respiratory problems and caused Dar-lington to contract contact dermatitis that resulted in permanent scarring. Thus, the basis of liability was the Defendants’ negligence, vel non, in maintaining and/or repairing the leaky pipe.
¶ 7. After the case was remanded, the parties filed numerous pretrial motions. The pretrial motions that are relevant to this appeal are as follows:
• On May 14, 2010, Ballard filed a motion to exclude all of the Ohazu-rikes’ experts, and on July 8, 2010, Ballard filed a supplemental motion to exclude the Ohazurikes’ experts, raising additional arguments addressing the timing and substance of the expert testimony of Dr. Glenda Glover. The motions were denied as to Glover and Kevin Lightheart. The court did not address the motion as to Jeffrey Chance and Robert Johnson, but allowed both to testify.
• On July 2, 2010, Ballard filed a motion in limine to suppress testimony and evidence concerning, inter alia: the fair market value of Ohazurike’s games before their destruction; the fair market value of Upstart Games & Amusements, Inc. and Kevin Lightheart’s valuation; the cost to restore the games to their pre-de-struction condition, including Robert Johnson’s expert testimony; lost earnings or profits; the results of mold testing on an air-conditioning filter from the Ohazurikes’ apartment; any alleged physical injuries caused by the alleged mold in the apartment; and “any evidence regarding the use of the ‘ri word, or any inference of racism or discrimination, by any of the defendants, or by any person associated with the defendants ... the only ... possible purpose for such evidence would be to impassion and prejudice the jury....”
• On July 8, 2010, Parham again filed a motion in limine to suppress, inter alia, Glover’s testimony and “any mention of a reference to any alleged claims that Marilyn Webster was forced by Defendants to file false charges of assault against Benny Ohazurike.”
¶ 8. A jury trial began on July 12, 2010. Among the Ohazurikes’ witnesses were Glover, Chance, Lightheart, and Johnson. Glover — who was tendered in the field of economics, not business valuation — offered two lost-future-profits estimates: $15.6 million and $2.85 million. Her opinions were based on a review of Ohazurike’s *57 business plan; Lightheart’s report; conversations with Wal-Mart associates; a visit to Toys-R-Us; and an Internet search on Amazon.com listing one of Oha-zurike’s games as a “collectible” for $30.00. Johnson opined about the cost to repair, restore, or replace nineteen games, based on having two technicians restore one game, then multiplying that amount by nineteen. Lightheart testified about the valuation report he had prepared relying on Ohazurike’s business plan projections, and did not perform any independent examination, investigation, verification, or evaluation of the books, records, and tax returns of the ten-year-old business. Oha-zurike’s friend, Chance, a mortgage broker, testified that he could have brokered 60,000 units of one of Ohazurike’s games, the “Stock Market” game, a game that Ohazurike had created in 1986 and copyrighted in 1987.
¶ 9. The jury found the Defendants 100 percent at fault, and awarded the Ohazu-rikes total damages of $3,603,712, consisting of the following damages for each plaintiff:
Benny— $2,000,000 for future lost profits of intellectual property
$2,208 for medical bills
$500,000 for pain and suffering
Esther— $253 for medical bills
$500,000 for pain and suffering
Darlington— $1,251 for medical bills
$500,000 for pain and suffering
$100,000 for permanent disfigurement.[3]
¶ 10. Ballard filed a “Motion for Judgment Notwithstanding the Verdict, or in the Alternative, Motion for New Trial, or in the Alternative, Motion for Remitti-tur[,]” arguing that reasonable persons could not have rendered the verdict against Defendants; that, if allowed to stand, the verdict would be a miscarriage of justice; and that the damages awarded were contrary to the overwhelming weight of evidence. Parham and Rice filed a separate “Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for a New Trial, or in the Alternative, Motion for Remittitur/ Motion to Amend the Judgment!,]” arguing that the verdict was against the manifest weight of evidence; the award of $1,603,712 for non-economic damages was excessive as a matter of law; the jury verdict was inflamed by bias, passion, and prejudice; expert and lay testimony should have been struck at trial; and the trial court failed to give two jury instructions. The trial court denied all motions. Ballard, Parham, and Rice appealed.
ISSUES
¶ 11. The parties framed the issues as follows:
1. Whether the trial court abused its discretion by admitting the expert testimonies of Glenda Glover, Kevin Lighth-eart, and Robert Johnson, and by allowing Jeffrey Chance, a lay -witness, to give expert testimony.
2. Whether the trial court committed reversible error by failing to grant a new trial on lost-profits damages, because Ohazurike failed to prove to a reasonable certainty that he had ever made a profit from selling games or that he could have made a profit if his games had not been destroyed.
3. Whether the trial court committed reversible error by failing to grant a new trial on personal-injury damages for Benny and Esther, because they failed to prove to a reasonable certainty that *58 their alleged respiratory problems were medically cognizable injuries.
4. Whether the trial court committed reversible error by failing to grant a new trial on personal-injury and permanent-disfigurement damages for Dar-lington, because the Ohazurikes failed to prove to a reasonable certainty that Darlington suffered medically cognizable injuries and permanent disfigurement.
5. Whether the trial court committed reversible error by failing to grant a new trial or a remittitur of the damages awarded by the jury, because the damages award was contrary to the substantial weight of the evidence, influenced by bias, passion, and prejudice, or so large as to shock the judicial conscience.
¶ 12. Issues one, two, and five are dis-positive and require a new trial. Thus, we decline to address issues three and four.
DISCUSSION
I. Standards of Review
¶ 13. This Court applies an abuse-of-discretion standard when reviewing the grant or denial of a motion for a new trial, the admission or exclusion of evidence, and discovery matters. United, Servs. Auto. Ass’n v. Lisanby, 47 So.3d 1172, 1176 (Miss.2010) (“The standard of review for the grant or denial of a motion for a new trial is abuse of discretion.”) (citations omitted); Rebelwood Apartments RP v. English, 48 So.3d 483, 490 (Miss.2010) (“[t]his Court reviews the admission or exclusion of evidence under an abuse-of-discretion standard of review.”); Palmer v. Volkswagen of America, Inc., 904 So.2d 1077, 1090 (Miss.2005) (“[o]nly in cases of abuse of discretion will we reverse a trial court’s ruling on discovery matters.”).
II. The trial court abused its discretion by allowing Glover to testify despite numerous discovery violations.
¶ 14. We find that the trial court abused its discretion by allowing Glover to testify despite numerous discovery violations, including failure to timely disclose the substance of Glover’s expected testimony and to seasonably supplement discovery responses, and allowing the witness to give previously undisclosed testimony at trial. Mississippi Rule of Civil Procedure 26(b)(4) provides that “[a] party may through interrogatories require any other party to [1] identify each person whom the other party expects to call as an expert witness at trial, [2] to state the subject matter on which the expert is expected to testify, and [3] to state the substance of the facts and opinions to which the expert is expected to testify and [4] a summary of the grounds for each opinion.” Miss. R. Civ. Proc. 26(b)(4)(A)(i). Additionally, Rule 26(f) provides that “a party who has responded to a request for discovery with a response that was complete when made ... is under a duty seasonably to supplement that party’s response with respect to any question addressed to ... the subject matter on which [a person expected to be called as an expert witness] is expected to testify, and the substance of the testimony.” Miss. R. Civ. Proc. 26®. We have provided that “[t]he failure seasonably to supplement or amend a response is a discovery violation that may warrant sanctions, including exclusion of evidence.” Hyundai Motor Am. v. Applewhite, 53 So.3d 749 (Miss.2011) (citation omitted).
¶ 15. The Ohazurikes failed to comply with Rule 26. In their original designation of experts, they named Glover as an expert witness and identified the subject matter of her opinions, but failed to state the substance of the facts and opinions to *59 which she was expected to testify or to provide a summary of the grounds for her opinions.[4] In their response to Ballard’s motion to strike their experts, they identified some facts upon which Glover’s opinion was based, but again failed to state the substance of those facts and provide a summary of her opinion.[5] The Ohazurikes did not provide the Defendants with the substance of Glover’s opinion until the morning of her deposition, five days prior to trial.[6] The Ohazurikes’ disregard for the rales of discovery continued to trial, when they violated Rule 26(f) by introducing for the first time a new opinion without having amended or supplemented their discovery responses.[7] In Hyundai Motor America v. Applewhite, 53 So.3d 749 (Miss.2011), we provided that, where a party had failed to amend or supplement its discovery responses with material changes to an expert’s opinion, the trial court’s refusal to grant any relief was an abuse of discretion warranting reversal, because “[w]e do not condone trial by ambush. [The defendant] was entitled to full and complete disclosure of the plaintiffs’ expert testimony....” Hyundai, 53 So.3d at 759. The introduction of an entirely new lost-profits estimate clearly was a material change to Glover’s opinion, of which the Defendants were entitled to full and complete disclosure seasonably before trial. We refuse to condone the Ohazurikes’ failure to comply with discovery requirements. Accordingly, we find that the trial court’s refusal to grant the Defendants any relief for the Ohazurikes’ failure to comply with the mandates of Rule 26 was an abuse of discretion and, combined with other errors to be discussed infra, warrants reversal.
III. The trial court abused its discretion by admitting the opinions of Glover, Johnson, and Lightheart.
¶ 16. We find that the trial court abused its discretion by admitting opinion testimony of Glover, Johnson, and Lighth- *60 eart for failure to satisfy the requirements for expert-opinion testimony under Mississippi Rule of Evidence 702. Rule 702 provides the standard for admitting expert testimony at trial:
*59 Glover is anticipated to provide opinions regarding the valuation of lost income to the Plaintiffs. Glover’s testimony is based on the valuation report completed by Kevin Lightheart and the business plan of Upstart Games, as well as[] the costs provided to repair or re-fabricate the damaged games.
On July 8, 2010, Ballard filed a supplemental motion to exclude Glover's testimony, arguing that (1) Glover was not properly designated as an expert, because no information was provided regarding the substance of the facts and opinions to which she was expected to testify within the discovery deadlines set by the trial court and (2) Glover’s testimony did not meet the reliability requirements for expert testimony. The record does not include any written response to the July 8 supplemental motion. Motions to exclude experts were argued on the morning of trial.
*60 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Miss. R. Evid. 702. We have explained that:
the trial court [is required to] perform a two-pronged inquiry in determining whether expert testimony is admissible under Rule 702.... First, the court must determine that the expert testimony is relevant — that is, the requirement that the testimony must “ ‘assist the trier of fact’ means the evidence must be relevant.” Next, the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the ... analysis is a flexible one.
Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 38 (Miss.2003) (citations omitted).

A. The trial court abused its discretion by admitting Dr. Glenda Glover’s testimony.

¶ 17. We find that, even if the discovery violations discussed supra had not occurred, the trial court abused its discretion by admitting Glover’s testimony, because her testimony wholly and completely failed to satisfy the requirements of Rule 702. Glover was tendered as an expert in the field of economics. We find that Glover based her lost-profit estimates on unsupportable facts and data, and they were not the product of reliable principles and methods, properly applied. Thus, her testimony failed to satisfy the requirements of Rule 702.
¶ 18. At trial, Glover testified that she had prepared two calculations of Ohazu-rike’s future lost profits. For her $15.6 million estimate, Glover reduced Ohazu-rike’s business-plan estimate that he would sell up to 400,000 units in the first year to 350,000 units (150,000 units of the Awareness game and 200,000 of the Stock Market game at per-unit prices ranging from $16 to $21). Ignoring actual business losses suffered and a history of meager sales over roughly fourteen years, she opined that Ohazurike would sell increasing quantities of the games after the first year, and even applied a growth rate for the failing enterprise. Glover discounted her projected forecasts to present value to arrive at $15.6 million in lost profits.[8]
¶ 19. We find that both of Glover’s ipse dixit estimates failed to satisfy the requirements of Rule 702 that expert opinions must be based on sufficient facts and data — not illusions — and must apply reliable principles and methods. We have provided that “we will not allow the only basis for an award of damages to be the injured party’s estimate of the extent to which he was injured.” Frierson v. Delta Outdoor, Inc., 794 So.2d 220, 226 (Miss.2001). Glover’s estimate of $15.6 million *61 was based on Ohazurike’s delusional business plan that he would have sold 350,000-400,000 units in the first year post-event if two of the six games in the business plan had not been damaged. (Four games included in the business plan were not damaged.) Glover merely adopted Ohazurike’s grandiose figures and then reduced the generated number to present value, while ignoring the business losses and history of the enterprise that, from its inception,[9] had sold only 10,000 units. We have provided that, in calculating future lost profits, “a party must deduct such items as overhead, depreciation, taxes and inflation ... ”— none of which were addressed in Glover’s report or testimony. Turpentine & Rosin Corp. v. Gulf Naval Stores Co., 188 So.2d 257, 258 (Miss.1966) (citation omitted). In a nutshell, the $15.6 million estimate of lost profits and related testimony was neither based on available facts and data, nor was it the product of accepted principles and methods, properly applied. Accordingly, we find that the trial court abused its discretion in admitting Glover’s testimony.
¶ 20. For the first time at trial, Glover offered another estimate of $2.85 million lost profits. Glover employed the following simple arithmetic formula:
anticipated gross sales = price per unit *
number of game units * number of games
[ ($30)(5,000)(19) = $2.85 million].
She derived the price of $30 per unit by finding a single unit of Insight for sale as a “collectible” on Amazon.com. She based her 5,000 unit figure for each of the nineteen damaged games based on Ohazurike’s pre-event sales of 5,000 units each of Insight and Challenge, over nearly a decade.[10] The formula accounted for no deduction for manufacturing and distributing costs and expenses, nor did Glover discount future profits (or was it anticipated gross sales?) to present value, and she utilized retail pricing.
¶ 21. Once again, Glover failed to base her $2.85 million estimate on actual historical facts and data and failed to apply reliable principles and methods. The estimate was not based on accurate facts and data, but rather was an amalgamation of sporadic past unit sales, a current price for an out-of-print game for sale as a “collectible,” and an assumption, undocumented by historical performance, that Ohazurike would have sold 5,000 units each of all nineteen of the damaged games in the first year alone. Glover’s use of past unit sales to establish lost profits was not reliable. A business’s ability to generate sales is not the same as its ability to generate profits. The record reveals that Ohazurike never generated a profit from selling games. The “collectible” price of thirty dollars likewise was based on improper data, for there was no evidence that Ohazurike had ever sold a game at that price. The thirty-dollar figure was contradicted by other testimony that Oha-zurike had sold Insight and Challenge in the $5-$10 per unit range. There was no basis in fact or available data for the unfounded assumption that Ohazurike would *62 sell 5,000 units each of every one of nineteen untested and unproven games. Oha-zurike had marketed and sold only two games of the more than 150 games that he created.[11] No evidence was offered that he would obtain financing to manufacture and sell any one of the nineteen games— some that he had created more than a decade before claiming they were damaged. Finding no basis in fact that Ohazu-rike, in the absence of financing, could or would bring to market any or all of the nineteen games or that he with reasonable certainty could sell 5,000 units of each at $80.00 (a retail price not supported by any other evidence), we conclude that Glover did not base a single component of her $2.85 million estimate on verifiable facts or data.
¶ 22. We likewise find that Glover did not use reliable principles and methods to reach her $2.85 million estimate, as the use of sporadic past unit sales combined with a current “collectible” price, absent deductions for costs and expenses, absent financing, and not reduced to present value, was a wholly unreliable method to calculate future profits.[12] We have provided that future lost profits must be calculated as net future profits, discounted to present value, so that “a party must deduct such items as overhead, depreciation, taxes and inflation^ and] ... future profits should always be discounted at an appropriate rate to arrive at present value.” Turpentine & Rosin, 188 So.2d at 258 (citation omitted); see Lovett, 511 So.2d at 1353 (“In calculating loss of future profits, such loss is that of net profits as opposed to gross profits.”) (citations omitted). Glover’s formula used a “collectible” asking price and inexplicably failed to include any deductions for manufacturing and production costs, expenses, shipping, advertising, or taxes, and, thus, provided an unrealistic estimate of future gross retail sales, not net future profits to Ohazurike. Thus, Glover’s illusory calculation was not a calculation of lost profits, but rather a calculation of projected gross retail sales, a poor and impermissible substitution for proving lost-profits damages.
¶ 23. Further, Glover failed to discount the ill-conceived future value to present value, as required for an award of damages for lost profits. See Turpentine & Rosin, 188 So.2d at 258 (providing that “future profits should always be discounted at an appropriate rate to arrive at present value.”). Glover’s failure to discount to present value was equivalent to assuming that all sales would occur in the first day — ie., that Ohazurike would sell 5,000 units of each of the nineteen games — a total of 95,000 units — in the first day, and zero units thereafter, even though his past game sales consisted of 10,000 units over approximately eight years. Glover as *63 sumed a one-year sales figure that was 9.5 times higher than the actual facts or data available of Ohazurike’s sales since 1996, fourteen years before the trial. We find that Glover failed to apply generally accepted reliable principles or methods as mandated by Rule 702 and our caselaw. Finding that her testimony was based on insufficient and faux facts and data, not the product of reliable principles and methods, properly applied, we conclude that the trial court abused its discretion in admitting Glover’s testimony.

B. The trial court abused its discretion by admitting Robert Johnson’s testimony.

¶ 24. While we find that Johnson’s testimony regarding board games was relevant to a fact in issue, we find that the cost to convert Ohazurike’s video-game concepts into board games strayed from recoverable damages. The cost of converting video-game concepts into board games is not a restoration of the games to their pre-damage condition, but is a fundamental change in the nature of the games. Any damages award based on the cost of converting video-game concepts into board games would constitute unjust enrichment rather than compensate Oha-zurike for the fair market value of his claimed loss. See Miss. Power Co. v. Harrison, 247 Miss. 400, 424, 152 So.2d 892, 903 (1963) (“in computation of damages a person is to be made whole, or complete satisfaction is to be made, or he is to recover the value of the property destroyed; it is never contemplated that the injured party should realize a profit from the damages sustained.”). Thus, Johnson’s testimony regarding video games was not permissible in measuring restoration costs. The trial court abused its discretion by allowing his testimony as to the four video games.
¶ 25. We further find that the trial court abused its discretion by finding that Johnson used reliable principles and methods to determine the restoration cost of the board games. Johnson assumed the same time and cost to restore every game, regardless of the stage of creation of each game before the event (ie., how close it was to being production ready) and the type of each game (card, board, or video). Johnson’s blanket restoration-cost estimate could not have accurately estimated restoration damages.
¶ 26. More importantly, the fact-finder was never furnished the fair market value at time of loss of any game. If restoration costs were less than the fair market value as of the date of the loss, then the jury could award restoration damages; however, if restoration costs exceed fair market value at the time of loss, the injured party is entitled only to the fair market value. Additionally, the plaintiff cannot recover both lost profits and the expense of restoration. See R.K. v. J.K., 946 So.2d 764, 777 (Miss.2007) (“It is well known that this state does not endorse double recovery.”); Ciba-Geigy Corp. v. Murphree, 653 So.2d 857, 873 (Miss.1994) (“the awarding of profits and expenses is a ‘double recovery.’ ”); Miss. Power Co. v. Harrison, 247 Miss. 400, 424, 152 So.2d 892, 903 (1963) (“in computation of damages a person is to be made whole, or complete satisfaction is to be made, or he is to recover the value of the property destroyed; it is never contemplated that the injured party should realize a profit from the damages sustained.”) (citation omitted). Without testimony establishing the fair market value of each game pre-event, Johnson’s testimony alone was insufficient to determine whether the estimate of restoration costs exceeded Ohazu-rike’s actual loss. Thus, we find that the trial court abused its discretion in admit *64 ting Johnson’s expert testimony, because: (1) he was not qualified to give an expert opinion on the cost to restore video-game plans; (2) his testimony regarding the cost to convert video-game plans into board games was improper, as such damages would not restore Ohazurike to his status quo before the games were damaged; and (3) his testimony, absent proof of the pre-event fair market value of the games, was not an admissible measure of damages.

C. The trial court abused its discretion by admitting Kevin Lightheart’s testimony.

¶ 27. The Defendants argue that Lightheart’s testimony was neither relevant nor reliable. Lightheart was qualified as an expert in accounting and valuation analysis, but his testimony regarding a 2006 valuation of Upstart, prepared to assist Ohazurike in obtaining financing to manufacture and produce games, was based on Ohazurike’s flawed business plan rather than available historical facts and data, which Lightheart acknowledged he relied upon ninety percent of the time, except in valuing new enterprises. Ohazu-rike’s enterprise was formed nearly twenty years before the report was prepared.
¶ 28. Lightheart testified that he was not attempting to prove lost profits. Lightheart’s pre-event valuation was based on Ohazurike’s business plan for six games, including Insight and three other games that were not among the nineteen damaged games. Lightheart testified that his valuation did not calculate the fair market value of any particular game.[13] Further, he testified that the valuation was not intended to calculate lost profits reliably. Lightheart testified that the sole purpose of the valuation was to assist Ohazurike in obtaining financing. Lightheart explained that, while historical data is the preferred basis for a business valuation, historical facts and data were not furnished to him. He based his valuation on the information and assumptions available — Ohazurike’s flawed business plan — though he recognized that such a valuation technique is “not an exact science” and that the sales and profit projections “may not come to fruition.... ” The valuation was an intentionally created, optimistic portrait of a speculative investment, not a realistic estimate of future profits, as Lightheart acknowledged.
¶ 29. We further find that Lightheart’s opinion was not reliable under Rule 702, because, according to his own testimony, he did not use reliable principles and methods or base his opinion on sufficient facts and data for his opinion to constitute an accurate portrayal of lost profits. We have provided that “lost profits will be allowed only if their loss is proved with a reasonable degree of certainty.” Cont’l Turpentine & Rosin Corp. v. Gulf Naval Stores Co., 188 So.2d 257, 258 (Miss.1966) (citation omitted). On cross-examination, Lightheart testified that his valuation was based on projections from Ohazurike’s business plan. Thus, like Glover’s $15.6 million estimate, Lightheart’s valuation was based on unreliable, lofty estimates and unfounded assumptions provided by Ohazurike. Lightheart acknowledged that historical data is a better basis for a valuation. He provided that his valuation would have been much lower if he had used historical data, and that he did not know how much lower. We conclude that the trial court abused its discretion by admitting such unreliable testimony.
IV. The trial court abused its discretion by allowing Chance, an unqualified lay witness, to give opinion testimony.
¶ 30. We find that the trial court abused its discretion by allowing Chance to *65 give opinion testimony, because Chance was neither tendered as an expert witness nor qualified to give an expert or a lay opinion on brokering, distributing, or selling games.
¶ 31. We find that Chance’s testimony that he could have brokered 60,000 units of the “Stock Market” game constituted an inadmissible opinion, not lay-witness fact testimony.[14] We have provided that testimony constitutes an expert opinion “where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult....” Sample v. State, 643 So.2d 524, 529-30 (Miss.1994). We have further provided that:
if a trial court must delve into a witness’ background to determine if he possesses the necessary education, experience, knowledge or training in a specific field in order for the witness to testify as to his opinions concerning that particular field, then M.R.E. 702 applies.
Roberts v. Grafe Auto Co., 701 So.2d 1093, 1098 (Miss.1997). Chance, a friend of Oha-zurike and a mortgage broker, offered no background information to qualify as an expert witness under Rule 702.
¶ 32. Thus, we return to Rule 701, which addresses the admissibility of a lay opinion as follows, in relevant part:
[i]f the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness [and] (b) helpful to the clear understanding of the testimony or the determination of a fact in issue....
Miss. R. Evid. 701.[15] For Chance’s testimony that he could broker 60,000 units of the game to be rationally based on his perceptions, he had to have some personal experience with distribution and sales. Chance had no experience, lay or expert, as a broker or distributor of games. He was a mortgage broker who was Ohazu-rike’s friend and worked in the same building as Ohazurike. His personal experience with selling games was limited to “about 500” units of Insight that he had sold out of his mortgage-brokerage office — the equivalent of a consignment retailer. Chance had attempted to broker the Stock Market game to more than 100 companies, and was rejected by all. Chance’s sales of 500 games retail does not equate to personal experience in brokering and mass distribution of games. Thus, his opinion fails to meet the requirement that an opinion must be rationally based on a witness’s perceptions — i. e., firsthand knowledge based on his observations or sensory experiences. We find that the trial court abused its discretion in allowing him to give an opinion in the absence of firsthand knowledge of brokering games or observing successful brokerage of games by another, as his attempt to broker to more than 100 companies was rejected by all. Chance’s statement that he could broker 60,000 units was not a fact, but an inadmissible opinion based on wishful thinking.
*66 We conclude that the trial court abused its discretion, for Chance’s testimony regarding the number of games he could broker and/or distribute was nothing more than conjecture or speculation; it was neither fact nor an opinion based on a factual foundation. See Miss. R. Evid. 701.
V. The trial court abused its discretion by failing to grant a new trial.
¶ 38. After careful examination of the evidence presented for the personal injury claims, the Court finds the evidence insufficient to support the damages awarded and, thus, the trial court abused its discretion by denying the Defendants a new trial on damages. We will reverse a trial court’s denial of a motion for a new trial when, “upon review of the entire record, we are left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice.” White v. Yellow Freight System, Inc., 905 So.2d 506, 511 (Miss.2004) (citation omitted). We conclude that a verdict based on personal injury damages would work a miscarriage of justice.
¶ 34. We likewise find that lost profits were not proven with a reasonable degree of certainty, and that no rational trier of fact could have found lost profits beyond a reasonable doubt. Accordingly, we conclude that a verdict based on lost-profits damages also would work a miscarriage of justice. Cont’l Turpentine & Rosin Corp. v. Gulf Naval Stores Co., 188 So.2d 257, 258 (Miss.1966) (“[i]n both tort and contract actions, lost profits will be allowed only if their loss is proved with a reasonable degree of certainty.”) (citation omitted).
¶ 35. For the same reasons that we find Glover’s testimony unreliable under Rule 702, we find that no testimony was offered to prove with a reasonable degree of certainty that Ohazurike lost profits. See supra ¶¶ 16-22. Furthermore, Glover’s use of past unit sales for her $2.85 million estimate was not only insufficient and unreliable — it was also misleading. We have found that a misleading use of past profits to project future profits is “legally insufficient to undergird a damages award....”[16] Lovett, 511 So.2d at 1353. Further, we specifically have provided that past gross receipts are insufficient to prove future profits, as follows:
[pjroof of the gross receipts of the business standing alone ... is not sufficient. The proof must pass the realm of conjecture, speculation, or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn.
“To come within the rule, it must be made to appear that the business which is claimed to have been interrupted was an established one which had been successfully conducted for such a length of time and had such a trade established that the profits thereof are reasonably ascertainable.”
Miss. Power Co. v. Harrison, 247 Miss. 400, 433, 152 So.2d 892, 908 (1963) (citation omitted). Even more clearly, then, Glover’s use of past unit sales combined with an invalid price (resulting in an overly optimistic estimate of anticipated future gross receipts) was within the realm of *67 conjecture or speculation and legally insufficient to support lost-future-prq/⅞ damages. The presentation of past unit sales figures to opine on lost profits was speculative and misleading, for Ohazurike had never earned a profit from selling games. The assumption that Ohazurike would have sold 5,000 units of each of the nineteen damaged games was unsupportable. Oha-zurike testified that he had manufactured and sold only two out of the more than 150 games he had previously designed and that he had failed to obtain financing to manufacture and sell any of the damaged games, despite having created multiple games as far back as 1986. Ohazurike had produced and sold only two of 150 games years before Glover prepared her calculations. He failed ever to earn a profit. Thus, no rational trier of fact could find beyond a reasonable doubt that Ohazu-rike’s business was “an established one which had been successfully conducted for such a length of time and had such a trade established that the profits thereof [were] reasonably ascertainable.” Harrison, 152 So.2d at 908. We conclude that Glover’s use of sporadic past sales does not “pass the realm of conjecture, speculation, or opinion not founded on facts” and did not “consist of actual facts from which a reasonably accurate conclusion regarding the ... amount of the loss c[ould] be logically and rationally drawn.” Harrison, 152 So.2d at 908. Accordingly, we find that the trial court committed reversible error by admitting evidence of lost profits and denying the Defendants’ motion for a new trial on damages.
CONCLUSION
1136. Based on the foregoing analysis, we reverse the judgment of the trial court and remand the case to the Hinds County Circuit Court for a new trial solely on damages.
¶ 37. REVERSED AND REMANDED.
CARLSON AND DICKINSON, P.JJ., LAMAR, CHANDLER, PIERCE AND KING, JJ„ CONCUR. KITCHENS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. WALLER, C.J., NOT PARTICIPATING.

. Ohazurike testified that “production ready” meant that "[s]ome of them was the board, the index cards, the questions.... I was putting also finishing touches to the games so that when I give it to the manufacturer they will be able to manufacture it. [So i]t will not come back with a mistake.... Some were on the index [cards]; some were on the paper."

. At some time between the filing of the complaint and the remand to state court, Arlington Properties, Kenneth Wayne Rice, individually, and all but one of the other individually-named “agents and/or employees” were dropped as defendants. The Ohazu-rikes' July 30, 2009, “Motion to Set Case for Trial” identified the following defendants: Parham, Ballard, Rice, Crystal Bridges-Cor-coran, and John Does 1 through 10.

. Darlington never appeared to testify regarding his pain and suffering or to exhibit his physical appearance at the time of trial.

. In their November 30, 2009, designation of expert witnesses, the Ohazurikes named Glover as an expert and provided that she was:
expected ... to testify to all things in her evaluations and opinions regarding the valuation of the lost income of the Plaintiffs and as to other things regarding the present value calculations and potential economic value and profitability of Plaintiffs company Upstart Games and the lost value of Plaintiff’s damages intellectual property board games.
The Ohazurikes attached a copy of Glover's curriculum vitae (CV) as an exhibit to their designation of experts and provided that "[a] copy of Dr. Glover’s report will be forwarded once it is received.”

. In their response to Ballard’s May 13, 2010, motion to strike Glover’s testimony, the Oha-zurikes stated that:

. Glover was deposed on Wednesday, July 7, 2010 — five days before the beginning of trial, Monday, July 12, 2010. On the morning of her deposition, Defendants' counsel first received Glover’s report via email, estimating lost profits of $15.6 million.

. At trial, Glover offered two estimates of lost profits, one of which was never previously disclosed.

. She described the $15.6 million as present value of future earnings in her report furnished five days before trial.

. Internal Revenue Service Revised Rule 59-60, cited in Glover’s report as authority, specifies factors to be analyzed in valuing closely-held corporations, including, among others: "[t]he nature of the business and the history of the enterprise from its inception”; ”[t]he book value of the stock and the financial condition of the business”; ”[t]he earning capacity of the company”; and "[t]he dividend paying capacity.”

. We note that, for her lower estimate, Glover assumed that Ohazurike could bring to market dll nineteen games at a per-unit price of $30, but for her higher estimate, she assumed that he would sell only two different games at per-unit prices of $ 16 — $21, per Oha-zurike's business plan, without explanation.

. He obtained copyrights for fifty-three of the 150 games.

. Past profits may be used to calculate future profits. Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss.1987). However, the record clearly reveals that there were no past profits. Upstart showed losses over ten years of $34,000. Past profits are reliable proof of lost future profits only when "the business ... was an established one which had been successfully conducted for such a length of time and had such a trade established that the profits thereof are reasonably ascertainable.” Miss. Power Co. v. Harrison, 247 Miss. 400, 433, 152 So.2d 892, 908 (1963) (citation omitted). No evidence established that Oha-zurike’s business was one with reasonably ascertainable profits, for he had sold only 10,-000 units between 1996 and around 2003 or 2004, had conducted no sales of games for the three or four years preceding the event, had offered no proof of business or sales from the event to trial for the numerous games that were not damaged, and had made no attempt to obtain his filings from the United States Copyright Office to get his other games market-ready.

. No witness offered the fair market value of any single game.

. Chance’s testimony describing a conversation with Ohazurike about a brokering deal for 60,000 units was lay fact testimony. However, Chance also testified regarding his opinion that he could have brokered the game.

. See also the comment to Rule 701, which provides, in relevant part, that:
[t]he traditional rule regarding lay opinions has been, with some exceptions, to exclude them from evidence. Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met. The first consideration is the familiar requirement of first-hand knowledge or observation. The second consideration is that the witness's opinion must be helpful in resolving the issues.

. We have provided that, although “[t]here are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits[,]” and "the degree of proof required usually depends on the particular facts of the case[,] ... [o]ne guideline frequently recognized by this Court is a party’s proof of its past profits.” Lovett, 511 So.2d at 1353 (citation omitted).