# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00520-COA

**INTERNATIONAL ASSOCIATION OF CERTIFIED HOME INSPECTORS AND NICK GROMICKO**　　　　　　　　　　　**APPELLANTS**

**v.**

**HOMESAFE INSPECTION, INC.**　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/17/2019 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GOODLOE TANKERSLEY LEWIS LAWRENCE JOHN TUCKER JR. |
| ATTORNEYS FOR APPELLEE: | TIMOTHY C. DAVIS STEPHAN L. McDAVID |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 03/01/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., WESTBROOKS, McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.　A trade association of home inspectors contracted with a company that holds patents on certain infrared home-inspection processes. Under the agreement, the trade association's existing members and certain new members would receive a license to use the patented technology in exchange for a specified portion of the new-member dues.

¶2.　But the deal never panned out. The patent holder ultimately sued the trade association and its founder for, among other claims, unjust enrichment, breach of contract, conversion,

fraudulent misrepresentation, and negligent misrepresentation. A jury returned a verdict against the trade association and its founder, individually.

**FACTS**

¶3.     When Nick Gromicko heard that a member of his trade organization was being sued for patent infringement, he reached out to the patent holder to strike a deal. Gromicko was the founder and face of the International Association of Certified Home Inspectors (InterNACHI). As a member of its board of directors, Gromicko wanted to find a way to protect the organization's 11,000 members from similar lawsuits.

¶4.     Gromicko contacted Kevin Seddon, the president of HomeSafe Inspection, Inc. HomeSafe holds the rights to a number of patents on certain infrared (IR) processes used by home inspectors to detect termites and other problems.[1] HomeSafe began as a franchisor that not only licensed infrared technology but also produced its own equipment and trained inspectors. Yet over the course of a decade, HomeSafe's business model changed, and the company developed a reputation as a mere "patent troll" that frequently threatened home inspectors with patent infringement lawsuits.[2] Today, HomeSafe's only employee is its

---

[1] To be precise, the infrared technology was developed at the National Center for Physical Acoustics at the University of Mississippi, where Seddon and a researcher named Peng Lee assisted with the project. Together Seddon and Lee established HomeSafe and acquired a license to the patents from the University.

[2] During his testimony at trial, HomeSafe's attorney Stephan McDavid disputed HomeSafe's reputation as a "patent troll," estimating that HomeSafe had filed a total of five infringement lawsuits in the past eleven years.

attorney, Stephan McDavid.[3]

¶5.     Shortly after Gromicko reached out to Seddon, talks of a deal between the two companies began.  In a series of emails and phone conversations, Seddon, McDavid, Gromicko, and InterNACHI's CEO brainstormed a possible licensing agreement.  Both sides quickly began to envision a money-making opportunity.  While InterNACHI sought access to HomeSafe's technology and protection from litigation, HomeSafe saw InterNACHI as its key to the home-inspection industry.  Seddon considered InterNACHI "a giant" and Gromicko "the most powerful person in the home inspection industry."  With InterNACHI's widespread influence, HomeSafe hoped to reach thousands of inspectors to market its technology.

¶6.     The parties contemplated giving InterNACHI a blanket license for all its members and utilizing its membership application process to keep track of and pay HomeSafe for the inspectors who used the patented technology.  With this concept in mind, McDavid drafted a contract, and the parties emailed edits and alterations back and forth.  During negotiations, Gromicko repeatedly expressed his belief that the venture would be highly profitable for all involved.  He wrote in one email, "This would be an instant killing and bring in huge piles of money[.]"  And in another he wrote, "Faster than a NY minute, the industry will know to save money by joining through your portal."

¶7.     Just as the companies were nearing an agreement, Gromicko discovered that

---

[3] McDavid also has part ownership in the company.  At trial he testified, "When HomeSafe revenues were low and they still needed legal help I agreed to help for some smart [sic] part of ownership. So that is how I'm [an] owner."

3

HomeSafe had been administratively dissolved by the Secretary of State. He emailed Seddon to look into the issue, and Seddon assured Gromicko, "That's already been corrected" but that the Secretary of State "just ha[s] not made the change online." Gromicko responded, "OK. Cool," and they proceeded with their plans.

¶8. After months of negotiating, InterNACHI and HomeSafe reached an agreement. Under the final contract, HomeSafe agreed to grant InterNACHI a bulk license for all its existing members to use HomeSafe's patented infrared technology. HomeSafe also agreed to "forbear any right it has to sue any present existing paying member of InterNACHI for any violation of any HomeSafe patent rights." In return, InterNACHI agreed to pay HomeSafe the new-member dues for each inspector who signed up for InterNACHI using the newly created "IR application," which would be separate from InterNACHI's existing application. New members who joined using the IR application would receive the benefit of the bulk license. The contract contained the following language with regard to the application process: "InterNACHI and HomeSafe will create an InterNACHI application and reapplication form specifically for members that are [using] or intend to use IR technology, referred to herein as 'IR Application.'"[4]

¶9. The contract was executed in the fall of 2013. Not long after, Seddon and McDavid grew frustrated with InterNACHI. Specifically, HomeSafe was dissatisfied with the location

---

[4] HomeSafe would receive "the full membership fees paid to InterNACHI for the first year of membership and one-half of the membership fees paid to InterNACHI for each subsequent year" until termination of the agreement. At the time of the contract, annual dues for membership in InterNACHI were $499. During negotiations, the parties discussed a discounted price of $399 for those who signed up using the IR Application.

and visibility of the IR application on InterNACHI's website. InterNACHI and HomeSafe had issued a press release announcing their partnership and including a link to the IR application, but the effort sparked little interest. So HomeSafe wanted a "landing page" on InterNACHI's website where all applicants were forced to choose between the regular InterNACHI application and the IR application.

¶10. Both Seddon and McDavid expressed these concerns to Gromicko via email but were unable to persuade him to alter the website. As Seddon would later testify, HomeSafe did not initially resort to legal action because they still hoped the venture would be successful and "didn't want to have bad blood in the industry."

## COURSE OF PROCEEDINGS

¶11. Almost two years after executing the contract, HomeSafe sued InterNACHI for violation of the Mississippi Unfair Trade Practices Act, common law unfair competition, unjust enrichment, breach of contract, and conversion.[5] One year later, HomeSafe filed an amended complaint, naming Gromicko as a defendant and asserting three additional claims: breach of a confidentiality agreement, fraudulent misrepresentation, and negligent misrepresentation. Several of the claims were dismissed, and the case went to trial on the remaining five: unjust enrichment, breach of contract, conversion, fraudulent misrepresentation, and negligent misrepresentation.

¶12. At trial, HomeSafe presented testimony from two witnesses: McDavid, the company's lawyer, and Seddon, its president. Through McDavid's testimony, HomeSafe presented

---

[5] InterNACHI filed a counterclaim against HomeSafe and a third-party complaint against Seddon, but both were dismissed.

5

extensive evidence of written communications between the parties, including a series of email negotiations prior to the contract. Although the contract did not explicitly include such a provision, McDavid interpreted the negotiations to mean that InterNACHI would alter its application process so that new members would be forced to disclose whether they use IR by choosing between the regular application and the IR application. Over objection, McDavid gave his opinion regarding the ways he believed InterNACHI had breached the contract. He believed InterNACHI did not comply with the terms of the contract "at all" and that "without a doubt" HomeSafe had been harmed by the breach.

¶13. McDavid also testified about the misrepresentation claims. When asked whether Gromicko had misrepresented "anything related to this deal," the lawyer responded, "Well, if his intent all along was to create a secret link hidden on a benefit page and not connected to his application process then he absolutely misrepresented it in our phone conversations as well as e-mails, as well as in the contract."

¶14. Seddon also testified about his communications with Gromicko prior to and following the contract, as well as the ways he believed InterNACHI breached the contract. According to HomeSafe's president, one reason InterNACHI had breached a duty was because Gromicko and the company "never set up the application process so that individuals could choose" which application to complete. In the months after the contract was executed, Seddon grew increasingly concerned that new InterNACHI members were using HomeSafe's patented infrared technology but had not signed up through the IR application. He believed this was because the new members were unable to find the link to the IR application. He and

6

McDavid reached out to Gromicko for information on new members, specifically which ones were using IR, but Gromicko did not give them the information they wanted.

¶15.    Using a list of home inspectors who had joined InterNACHI in the time since the execution of the contract, Seddon sought to uncover which, if any, members were improperly using HomeSafe's infrared technology.  It was this effort that formed the basis for HomeSafe's damages model.  Although Seddon was not directly involved in creating the damages model, he was the only person who testified about it at trial.  The court admitted the model into evidence over InterNACHI's objection.

¶16.    The damages model operated under the assumption that every inspector who used infrared technology also advertised it on their websites.  To gather the data, Seddon hired a group of unidentified people to conduct online research on each InterNACHI member who had joined since the execution of the contract.[6]  First, the unknown researchers looked up each new member to see if he or she had a website.  Using an online archive called the "Wayback Machine," they searched to find the version of the new member's website that was live at the time the inspector signed up for InterNACHI.[7]  The researchers found that 2,757 of the 4,319 "Total Members Researched" had websites. They then determined that 711 of the members with websites advertised and therefore were "practicing IR."

---

[6] Seddon could not even recall how many people did the research, but he speculated it was eight.

[7] The Wayback Machine is housed on a website called Internet Archive.  The Internet Archive is "a digital library of Internet sites and other cultural artifacts in digital form" that "provide[s] free access to . . . 25+ years of web history accessible through the Wayback Machine."  Internet Archive, *About the Internet Archive*, https://archive.org/about/ (last visited Mar. 1, 2022).

¶17.   Using this data, HomeSafe attempted to show the money it allegedly should have received had InterNACHI complied with the contract.  According to the damages model, HomeSafe was owed new member fees of $400 for inspectors using infrared technology (and should have signed up under the IR application) and $200 for each year those inspectors renewed their InterNACHI membership during the contract period.  The spreadsheet included four different damages calculations ranging from $284,400 to $636,649.11.

¶18.   Each estimate was based on various assumptions.  The maximum damages estimate "Assumes All Members Renewed" their membership "and Same Percentage of Members with IR Apply To Those Without Websites."  Similarly, the next calculation "Assumes All Members Renewed and No Member Without a Website Practices IR."  Another one "Assumes No Members Renewed and Same Percentage of Members With IR Applies to Those Without Website."  Finally, the minimum estimate "Assumes No Member Renewed and No Member Without A Website Practices IR."

¶19.   On cross-examination, Seddon was asked the names of the individuals who worked on the model and how many there were.  He responded, "I don't recall their names," and he said, "I believe, I'm trying to count.  8.  I think."  When asked whether these people used "any kind of recognized methodology for surveying information on the square, on the Internet and aggregating it, collecting it things of that nature," Seddon said, "No. We just thought this was the best way that we could begin to gather the information so that would give us an idea."

¶20.   InterNACHI's only witness was Gromicko, who considered himself the "deal maker"

of the company. Gromicko said that InterNACHI's website contains over 280,000 pages and that it does not advertise for anyone. He insisted though that when people searched "IR" on the website, it would take them to the press release that contained the link to the IR application.

¶21. InterNACHI did not present a competing damages model. However, it did seek to introduce testimony about the damages theory from an expert witness, but the trial court refused to allow the witness to testify.

¶22. At the conclusion of the three-day trial, the jury returned a general verdict, finding InterNACHI liable for breach of contract and conversion. InterNACHI and Gromicko were found liable for negligent misrepresentation but not fraudulent misrepresentation. The jury awarded a total of $627,791.67 in compensatory damages—$329,590.63 against InterNACHI and $298,201.04 against Gromicko, individually.

## DISCUSSION

¶23. InterNACHI raises seven issues on appeal. We need only address three: whether HomeSafe had standing to sue InterNACHI; whether HomeSafe proved compensatory damages with reasonable certainty; and whether HomeSafe proved negligent misrepresentation.

### I. Corporate reinstatement restored HomeSafe's ability to maintain suit.

¶24. InterNACHI argues that HomeSafe lacked standing. In order to address the issue of standing, we must first consider the effect of HomeSafe's administrative dissolution on its ability to sue. "The standard of review for issues of standing is de novo." *Araujo v. Bryant*,

283 So. 3d 73, 76 (¶8) (Miss. 2019).

¶25. A corporation has "no right to pursue" a lawsuit during administrative dissolution. *Columbus Cheer Co. v. City of Columbus*, 155 So. 3d 744, 746 (¶8) (Miss. 2014) (holding that a company could not file suit because it was administratively dissolved); *see also* Miss. Code Ann. § 79-4-14.21(f) (Rev. 2013) ("A corporation that has been administratively dissolved may not maintain any action, suit or proceeding in any court of this state until the corporation is reinstated."). Therefore, the general rule is that an administratively dissolved corporation cannot sue but rather can "only *defend* an action ongoing at the time of an administrative dissolution." *Wayne Johnson Elec. Inc. v. Robinson Elec. Supply Co.*, 266 So. 3d 643, 649 (¶¶19-20) (Miss. 2019) (emphasis in original). The Supreme Court has further held that "an administratively dissolved corporation cannot *maintain* a legal action" after it is filed, even when the dissolution comes after filing. *Id*. at 649 (¶20) (emphasis added).

¶26. In *Wayne Johnson*, an electric company called Johnson Electric sued a supply company. *Id*. at 645 (¶3). During the course of proceedings, Johnson Electric was administratively dissolved for its failure to file an annual report. *Id*. at 646 (¶8). The supply company then filed a motion to dismiss, arguing that under section 79-4-14.21(f), "because Johnson Electric had been administratively dissolved, it could not continue in the lawsuit." *Id*. Considering its precedent on the issue, the Court reasoned, "Even though in *Columbus Cheer* the corporation was administratively dissolved prior to the commencement of litigation and here Johnson Electric was dissolved during proceedings, *Columbus Cheer* still applies to the extent it holds that an administratively dissolved corporation cannot maintain

10

a legal action." *Id*. at 649 (¶20). Ultimately, the Court held that "Johnson Electric [could] not continue th[e] suit because it ha[d] been administratively dissolved." *Id*. at 649 (¶19).

¶27.    So precedent is uniform that administrative dissolution prior to or during a lawsuit will bar a company's ability to maintain suit. Conversely, administrative reinstatement restores a corporation's ability to file or maintain a lawsuit. *Bryant Const. Co. v. Cook Const. Co.*, 518 So. 2d 625, 631-32 (Miss. 1987) (finding that "[b]y the time the amended complaint was filed . . . the [administrative] suspension had been set aside," so the company could file suit). Indeed, the applicable section of the Mississippi Code was amended in 2013 and now explains that "reinstatement relates back to and takes effect as of the effective date of the administrative dissolution[.]" Miss. Code Ann. § 79-4-14.22(c)(1) (Rev. 2013).

¶28.    In *Bryant*, a construction company was suspended for failure to file annual reports and pay franchise taxes.[8] *Bryant*, 518 So. 2d at 627. During suspension, it sued another company for breach of contract. *Id*. at 626. The trial court dismissed the original complaint for lack of standing. *Id*. In the meantime, Bryant Construction Company's suspension was set aside, and it filed an amended complaint. *Id*. at 627. Regardless, the trial court then dismissed the amended complaint, again for lack of standing. *Id*.

¶29.    The Supreme Court reversed and remanded. *Id*. at 632. The Court's ruling hinged on Bryant Construction Company's reinstatement as an active corporation, finding that "[a]t

---

[8] Mississippi statutes now use the phrase "administrative dissolution" instead of "suspension." *See* Miss. Code Ann. § 79-4-14.20 (Rev. 2013) (listing six grounds for administrative dissolution); *Id*. § 27-13-17 (suggesting that a corporation that fails to pay a tax may face administrative dissolution). *Bryant* specifically dealt with the latter statute. *Bryant*, 518 So. 2d at 629.

11

the time [the amended] complaint was filed, Bryant had been reinstated and thus had the right to sue." *Id*. at 631-32. Further, the Court explained the public policy behind the concept of administrative dissolution: "[t]he actual effect . . . then, is that the corporation, although it exists, is deprived of its state-granted power and capacity to function." *Id*. at 629. By being reinstated, a company then regains the power it lost due to its suspension or dissolution.

¶30. The current statutes addressing administrative dissolution essentially track the language of the statutes at issue in *Bryant* and explain how reinstatement restores the rights of a corporation. The Mississippi Code lists the reasons the Secretary of State may administratively dissolve a corporation. Miss. Code Ann. § 79-4-14.20. These reasons include, among others, failure to "pay . . . any franchise taxes or penalties" and failure to "deliver its annual report." *Id*. Section 79-4-14.21(f) states, "A corporation that has been administratively dissolved may not maintain any action, suit or proceeding in any court of this state until the corporation is reinstated." Concerning the effect of reinstatement, the section 79-4-14.22 states:

> (1) The reinstatement relates back to and takes effect as of the effective date of the administrative dissolution;
>
> (2) Any liability incurred by the corporation, director, officer or a shareholder after the administrative dissolution and before the reinstatement shall be determined as if the administrative dissolution had never occurred; and
>
> (3) The corporation may resume carrying on its business as if the administrative dissolution had never occurred.

¶31. The present case is factually similar to *Bryant* in several key ways. The following timeline, which includes a list of events relevant to HomeSafe's corporate status and its

12

lawsuit against InterNACHI, reflects those similarities.

| | |
|---|---|
| March 2003: | HomeSafe is incorporated. |
| October 2013: | HomeSafe is administratively dissolved by the Secretary of State for failure to file an annual report. |
| October 2013: | HomeSafe and InterNACHI enter into a contract. |
| March 2014: | HomeSafe forms a new entity while administratively dissolved. |
| January 2015: | HomeSafe sues InterNACHI. |
| August 2015: | HomeSafe is reinstated by the Secretary of State. |
| January 2016: | HomeSafe seeks leave to amend its complaint against InterNACHI. |
| February 2016: | HomeSafe files Amended Complaint, naming Gromicko as an individual defendant. |

¶32. Like the company in *Bryant*, HomeSafe was administratively dissolved by the Secretary of State for the failure to file an annual report. Its reinstatement was delayed due to issues regarding taxes. While administratively dissolved, HomeSafe sued InterNACHI for breach of contract, among other claims. It is clear then under *Columbus Cheer* and *Wayne Johnson* that at this point, HomeSafe lacked authority to sue, and any lawsuit it initiated during this time must have been dismissed.

¶33. However, by the time HomeSafe filed its amended complaint, it had been reinstated to active corporate status. Applying *Bryant* to the particular facts and circumstances of this case, we hold that HomeSafe's 2015 reinstatement to active corporate status authorized it to "maintain any action, suit or proceeding in any court of this state . . . ." Miss. Code Ann.

13

§ 79-4-14.21(f). Because the amended complaint was filed after HomeSafe's reinstatement and "relate[d] back to and t[ook] effect as of the effective date of the administrative dissolution[,]" HomeSafe had standing to maintain its lawsuit against InterNACHI. Miss. Code Ann. § 79-4-14.22(1).

¶34. Nonetheless, InterNACHI argues that the incarnation of HomeSafe that filed the original complaint was not the administratively dissolved corporation but instead a 2014 entity HomeSafe incorporated for the alleged purpose of continuing business during the original company's dissolution.[9] However, this position is not supported by the record before the Court. The record as a whole establishes that the administratively dissolved HomeSafe was the only plaintiff throughout this case.

¶35. Notably, language in the pleadings by both parties signifies that the original HomeSafe is the party to this lawsuit—not the 2014 entity. First, both the original complaint and the amended complaint filed by HomeSafe state, "Plaintiff is the owner of certain patented processes for using infrared cameras to detect home inspection problems, such as insect infestation, moisture problems, and air quality issues." The patents are owned by the 2003 HomeSafe corporation. The complaint and amended complaint also include the following fact: "Defendant and Plaintiff entered into an agreement dated October 23, 2013." Likewise, InterNACHI admitted in both its answers that "it entered into a written agreement

_____

[9] The 2014 entity is now dissolved. The Secretary of State's website names multiple entities associated with HomeSafe companies. Many of these are now dissolved except the original entity incorporated in 2003. These list either Kevin Seddon or Stephen McDavid or both as corporate directors, such as HOMESAFE INSPECTION, INC.; HomeSafe Inspection, Inc.; HomeSafe ASM, LLC; HomeSafe JV Holdings, LLC; Atlanta HomeSafe, LLC; Chicago HomeSafe, LLC; and MidSouth Homesafe, LLC.

14

with Plaintiff. . . ." Indeed, the 2014 HomeSafe entity did not yet exist at the time the contract was formed in 2013. Further, the plaintiff identifies itself as "HOMESAFE INSPECTION, INC." on both the original complaint and the amended complaint. The contract with InterNACHI states that the agreement was "by and between HOMESAFE INSPECTION, INC." And when HomeSafe sought to amend its complaint—an action InterNACHI did not oppose—it did not substitute parties.

¶36. In addition to the pleadings, the trial transcript reveals that InterNACHI was not concerned with the corporate identity of the HomeSafe plaintiff. The only questions posed by counsel for InterNACHI at trial were focused on whether HomeSafe was administratively dissolved at the time it entered into negotiations and contracted with InterNACHI. Both McDavid and Seddon were repeatedly questioned about whether HomeSafe was administratively dissolved; both men admitted it was dissolved at the time it entered into the contract with InterNACHI.[10] The testimony also underscored that HomeSafe had been reinstated in 2015. The questions by InterNACHI were fully grounded in the assumption that the 2003 incarnation of HomeSafe was the entity that filed and maintained the lawsuit. This questioning, considered along with the pleadings, clarifies that the only plaintiff to this lawsuit was the then-administratively dissolved HomeSafe entity incorporated in 2003.

¶37. Under the Mississippi Code and the rule set forth in *Bryant*, reinstatement restored

---

[10] While the thrust of these questions seemed to critique HomeSafe for entering into a contract while being administratively dissolved, the Supreme Court has expressly ruled that this fact is not a defense to breach of contract. *See Bryant*, 518 So. 2d at 630 ("Insofar as Cook claimed Bryant's suspension prevented the latter from entering into a contract, the defense is prohibited" by statute); *see also* Miss. Code Ann. § 79-4-3.04(a)-(b) (Rev. 2013).

15

HomeSafe's right to maintain the lawsuit. We therefore find that HomeSafe had standing.

## II. HomeSafe did not prove compensatory damages with reasonable certainty.

¶38. InterNACHI argues that "HomeSafe's compensatory damages model is speculative, unreliable, and unmoored to any methodology" and that "therefore, HomeSafe cannot recover more than nominal damages for breach of contract or conversion."

### A. Breach-of-Contract Damages

¶39. The purpose of breach-of-contract damages "is to put the injured party in the position where she would have been but for the breach." *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 417 (¶54) (Miss. 2018). But the Supreme "Court has never contemplated that an injured party be placed in a better position than she would have been had the contract been performed." *Id*.

¶40. "Monetary damages are a remedy for, not an element of, breach of contract." *Bus. Commc'ns Inc. v. Banks*, 90 So. 3d 1221, 1225 (¶11) (Miss. 2012). "[A] plaintiff seeking monetary damages for breach of contract must put into evidence, with as much accuracy as possible, proof of the damages being sought." *Id*. at (¶12) (internal quotation marks omitted). "Without proof of actual monetary damages, a plaintiff cannot recover *compensatory* damages under a breach-of-contract action." *Id*. (emphasis in original).

¶41. "Damages may only be recovered when the evidence presented at trial removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty." *Emergency Med. Assocs. of Jackson PLLC v. Glover*, 189 So. 3d 1247, 1262 (¶70) (Miss. Ct. App. 2016) (cleaned up).

16

¶42. The burden is on the plaintiff to prove the measure of damages "with reasonable certainty." *Soffra v. Shieldsboro Dev. Inc.*, 314 So. 3d 129, 143 (¶54) (Miss. Ct. App. 2020). "In any case a plaintiff is required to place into evidence such proof of damages as the nature of his case permits, with as much accuracy as . . . reasonably possible for him." *Id*. (quoting *Thomas v. Global Boat Builders & Repairmen Inc.*, 482 So. 2d 1112, 1116 (Miss. 1986)). "An award of damages must be reversed if it is speculative and is not based on the evidence presented at trial." *Id*.

¶43. This case is essentially one for lost profits. The record indicates that InterNACHI and HomeSafe executed the contract with the intention of generating income and later sought actual monetary damages on the basis. In its complaint, HomeSafe stated that it "will suffer . . . the loss of sales and profits [it] would have made but for Defendant's act[.]" Likewise, through its damages model, HomeSafe attempted to calculate the amount of money it allegedly would have received had InterNACHI properly carried out the terms of the contract.

¶44. A classic example of the requirements to claim lost profits is in *Ballard Realty Co. v. Ohazurike*, 97 So. 3d 52 (Miss. 2012). There, a tenant named Ohazurike and his family sued the owners of an apartment complex for negligence. *Id*. at 55 (¶4). Ohazurike designed board, card, and video games, many of which he stored at the apartment. *Id*. at (¶3). When a pipe burst in the apartment, water damaged nineteen of his "production-ready" games. *Id*. at (¶2). Ohazurike and his family brought claims against the apartment complex and its affiliates for negligent maintenance and repair of the leak, as well as other claims and sought

17

damages for personal injuries and loss of intellectual property. *Id*. at 56 (¶6).

¶45.    The game maker's damages model was based in part on "a review of [his own] business plan; [a witness's] report; conversations with Wal-Mart associates; a visit to Toys-R-Us; and an Internet search on Amazon.com listing one of Ohazurike's games as a 'collectible' for $30.00." *Id*. He presented two lost-profit figures: $15.6 million and $2.85 million. *Id*. However, of the hundreds of games he designed, Ohazurike marketed only two, and his company never made a profit. *Id*. at 55 (¶3).

¶46.    The jury determined the apartment complex was 100 percent at fault. *Id*. at (¶9). In total, the plaintiffs were awarded damages of over $3.6 million. *Id*. Two million dollars of the total award went to Ohazurike for "future lost profits of intellectual property." *Id*.

¶47.    The apartment complex argued that lost-profit damages were not proved with reasonable certainty. *Id*. at 57 (¶11).

¶48.    The Supreme Court agreed and held that "lost profits were not proven with a reasonable degree of certainty, and that no rational trier of fact could have found lost profits beyond a reasonable doubt." *Id*. at 66 (¶34). The Court explained that Ohazurike failed to sufficiently prove the loss, since "no testimony was offered to prove with a reasonable degree of certainty that Ohazurike lost profits." *Id*. at (¶35).

¶49.    In particular, the Court took issue with the game maker's reliance on his "delusional business plan" as a basis for measuring damages, noting, "We have provided that we will not allow the only basis for an award of damages to be the injured party's estimate of the extent to which he was injured." *Id*. at (¶19) (internal quotation mark omitted) (quoting *Frierson*

18

*v. Delta Outdoor Inc.*, 794 So. 2d 220, 226 (¶15) (Miss. 2001). In describing the lost-profits estimate, the Court noted the reliance on unsupported facts and data and "an *assumption*, undocumented by historical performance, that Ohazurike would have sold 5,000 units each of *all nineteen* of the damaged games in the first year alone." *Id*. at (¶21) (emphasis in original).

¶50. In conclusion, the Court found that the damages claimed were "an overly optimistic estimate of anticipated future gross receipts" rather than lost profits and fell "within the realm of conjecture or speculation [that is] legally insufficient to support lost-future-*profits* damages." *Id*. at 66-67 (¶35) (emphasis in original). The Court explained that the lost-profits estimates were "speculative and misleading, for Ohazurike had never earned a profit from selling game," and "[t]he assumption that Ohazurike would have sold 5,000 units of each of the nineteen damaged games was unsupportable." *Id*.

¶51. In this case, just as in *Ohazurike*, speculation is baked into the damages model. The four different damages calculations were based on multiple assumptions. Indeed, the model itself presented the jury with what it described as "assumptions."

| | | |
|---|---|---|
| *Assumes All Members Renewed and Same Percentage of Members With IR Apply To Those Without Websites-->* MAX. COMPENSATORY DAMAGES DUE | $ | 636,649.11 |
| *Assumes All Members Renewed and No Member Without A Website Practices IR-->* COMPENSATORY DAMAGES DUE | $ | 406,400.00 |
| *Assumes No Members Renewed and Same Percentage of Members With IR Applies to Those Without Website-->* COMPENSATORY DAMAGES DUE | $ | 445,529.05 |
| *Assumes No Member Renewed And No Member Without A Website Practices IR-->* MIN. COMPENSATORY  DAMAGES DUE | $ | 284,400.00 |

¶52. In addition to the conceded "assumptions," there were several more assumptions inherent in the model. First, the model assumed every inspector who uses infrared technology would advertise it on their websites. Second, the model assumed that inspectors

who advertised infrared technology were actually using it. Third, the model assumes inspectors are using the specific infrared technology HomeSafe licensed. Last, even if the inspectors are using the HomeSafe processes, the model also assumes they would have chosen to sign up using the IR application. Yet as McDavid conceded at trial, "We certainly couldn't force them to pick one [application] over the other."

¶53.　Just as the lost-profit estimate in *Ohazurike* was "an *assumption*, undocumented by historical performance" that the game maker would have sold more games than ever before if not for the water leak, 97 So. 3d at 57 (¶11), the damages model in this case assumes that hundreds, or even thousands, of home inspectors would have signed up through the IR application had it been more prominently displayed on InterNACHI's website. Layering assumption on top of assumption, the damages model *required* the jury to speculate as to the amount of damages and failed to transport it "through the twilight zone and into the daylight of reasonable certainty." *Glover*, 189 So. 3d at 1262 (¶70). Applying the standards set forth in *Ohazurike*, we cannot uphold an award based on such a degree of speculation and conjecture.

¶54.　Troublingly, the data was compiled by a group of unidentified individuals hired by HomeSafe—none of whom testified at trial. HomeSafe's only witnesses were McDavid and Seddon, and neither was directly involved in creating the damages model. Seddon did not disclose the names of the individuals who worked on it and said at trial he could not even name one. He also could not say for certain the number of people who were involved. Notably, they did not utilize "any kind of recognized methodology," and aside from Seddon's

20

"spot check," no one sought to verify the information gathered.

¶55.    Here, like in *Ohazurike*, the jury was presented with a range of estimates to determine compensatory damages for lost profits.   Because the damages model in this case is speculative and inherently based on unsupportable assumptions, we are compelled to reverse.

¶56.    While HomeSafe did not present evidence sufficient to prove actual monetary damages, HomeSafe did, as the jury found, prove that InterNACHI breached the contract.[11] "[W]here a suit is brought for a breach of a contract, and the evidence sustains the claim, the complainant is entitled to recover at least nominal damages for the failure of the defendant to carry out his agreement." *Banks*, 90 So. 3d at 1226 (¶15).

¶57.    For the above reasons, we reverse the compensatory damages award and remand to the trial court to determine nominal damages for the breach of contract.

### B.    Conversion Damages

¶58.    The jury also found InterNACHI liable for conversion.   As with the breach of contract, InterNACHI does not challenge the finding of conversion on appeal—only the measure of damages.[12]   InterNACHI argues that HomeSafe failed to prove damages for its conversion claim.

¶59.    "In a conversion action, the measure of damages is the value of the property at the time and place of the conversion." *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767,

---

[11] InterNACHI does not challenge—and therefore concedes—that it breached the contract for purposes of this appeal.  *See* MRAP 28(a).

[12] InterNACHI therefore concedes the finding of conversion for purposes of this appeal.  *See* MRAP 28(a).

775 (¶25) (Miss. 2004).  Compensatory damages, including those for conversion, must be proved "with reasonable certainty."  *Soffra*, 314 So. 3d at 143 (¶54).  Generally speaking, "[a] plaintiff is also entitled to nominal damages when conversion is proved but no damages are proved."  90 Am. Jur. 3d *Proof of Facts* § 341 (2006).

¶60.    Because the jury returned a general verdict in this case, the amount of damages attributed specifically to the conversion claim cannot be known.  However, the jury was given only one damages model at trial.  The record indicates HomeSafe intended for the jury to use the damages model in calculating conversion damages, and HomeSafe's brief on appeal states that the "same value for each license" provided in the damages model "is equally applicable to the conversion claim."

¶61.    On appeal, InterNACHI re-urges the core of its motion for remittitur filed with the trial court, arguing that due to the scarcity of proof of actual damages, "[n]o more than nominal damages should have been awarded for breach of contract and/or conversion[.]"  We have already determined that the damages model was too speculative to sustain compensatory damages for the breach of contract, and this same finding applies to HomeSafe's claim for conversion.  Therefore we agree that HomeSafe is entitled to no more than nominal damages for its conversion claim.

¶62.    Accordingly, we remand the issue of nominal damages to the Circuit Court of Lafayette  County with instructions to reconsider InterNACHI's motion for remittitur and determine nominal damages in accord with this Court's decision.  What constitutes nominal damages for conversion is a matter to be determined by the trial court.

**III.    HomeSafe did not prove negligent misrepresentation.**

¶63.    InterNACHI and Gromicko argue that the jury's verdict on negligent misrepresentation cannot stand because HomeSafe failed to prove the essential elements of the claim. Specifically, they argue that HomeSafe did not prove a misrepresentation of "any presently existing fact and neither opinions nor promises of future conduct are actionable in the absence of fraudulent intent not to perform."

¶64.    The Mississippi Supreme Court has explained that "[o]nce the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found." *Entergy Miss. Inc. v. Bolden*, 854 So. 2d 1051, 1054 (¶6) (Miss. 2003).

¶65.    To prevail on a claim of negligent misrepresentation at trial, a plaintiff must prove each of the following elements by a preponderance of the evidence: "(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance." *Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 731 (¶52) (Miss. Ct. App. 2014).

¶66.    Critical to this case, "the first element of negligent misrepresentation, misrepresentation of a fact, must concern a *past or present fact* as contrasted with a promise

23

of future conduct." *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 743 (¶74) (Miss. 2019) (emphasis added) (quoting *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992)). This rule comes from a long line of precedent holding that the alleged misrepresentation "must concern a fact rather than an *opinion*" and that the fact must be "past or presently existing." *Spragins*, 605 So. 2d at 780-81 (emphasis in original). The claim "cannot be predicated on a promise relating to future actions." *Id.*[13]

¶67. Our Supreme Court addressed this distinction between existing facts and future promises more than three decades ago. *See Bank of Shaw, a Branch of Grenada Bank v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990) ("It is well-settled law that, except in cases of fraud, the first element of the tort of negligent misrepresentation must involve a representation concerning a past or present fact"). In *Posey*, a man and his stepson borrowed money from a local bank in order to establish a sporting goods store. *Id.* at 1356. Their business "operated at a loss for the entire time it was open." *Id.* at 1357. Falling deeper in debt, they continued to borrow money from the bank. *Id.* Over a one-year period, the pair took out a series of loans from the bank totaling nearly $200,000, which they did not pay back. *Id.* They also turned to the Small Business Administration for help. *Id.* After receiving word that their small business loan applications had been rejected and that the bank "would not lend them any further funds or extend the term of their existing debts," Posey and

---

[13] Our Supreme Court has held that "even in cases where fraud is alleged, a promise of future conduct does not meet the requirement of a 'representation' unless the promise was made with the present intent not to perform[.]" *Bank of Shaw, a Branch of Grenada Bank v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990). To the extent HomeSafe presented evidence of such promises, the jury declined to find InterNACHI or Gromicko liable for fraudulent misrepresentation.

24

Watkins "began liquidating the store's inventory." *Id*. at 1358. They subsequently brought suit against the bank for negligent misrepresentation and several other claims. *Id*.

¶68. Posey and Watkins based their negligent misrepresentation claim on an allegation that the bank officer "committed to lend them approximately $125,000.00 to be invested in their new business and represented to them, that at the conclusion of a one-year period, a renewal note of all interim loans would be made financing the principal and interest for a five-year period" and that the officer told them that if their small business loan application was rejected, the bank "would lend them $362,000.00 on the same terms and conditions as they were seeking from the SBA." *Id*. at 1359. At the conclusion of trial, the jury awarded over $300,000 in damages to Posey and Watkins.

¶69. On appeal, the bank contended that "the trial court erred in instructing the jury on the issue of negligent misrepresentation" and that it "erred in denying the Bank's motion for a directed verdict on that issue." *Id*. Its argument hinged on the notion that "[t]he alleged misrepresentation concerning long-term financing was not a representation about an existing fact but was a promise of future conduct which will not support an action for negligent misrepresentation." *Id*.

¶70. The Supreme Court agreed. *Id*. Classifying the bank officer's alleged commitment as "a promise of future conduct and not a statement of fact sufficient to constitute the kind of representation which would support a claim of negligent misrepresentation," the Court found that "the first element of negligent misrepresentation was not proven at trial and that the trial court should not have allowed that issue to go to the jury." *Id*. at 1360. Ultimately,

the Court made clear that "[t]he promise of future conduct is, as a matter of *law*, not such a representation as will support recovery under a theory of negligent misrepresentation." *Id*. at 1360 (emphasis in original).

¶71. Here, in an effort to prove misrepresentation, HomeSafe presented evidence of various statements Gromicko made, primarily those sent via email. Much like the bank officer in *Posey*, Gromicko made lofty promises to HomeSafe during negotiations and even after the contract was signed. For example, Gromicko said the following in an email to Seddon: "This would be an instant killing and bring in huge piles of money . . . and keep revenues coming into you forever and ever. We have thousands of new inspectors entering the industry every year, many of which will buy an IR camera." Gromicko also said things like "Faster than a NY minute, the industry will know to save money by joining through your portal." Gromicko's statements clearly fall within the category of future promises. As *Posey* made clear, a claim for negligent misrepresentation must involve past or presently existing facts.

¶72. HomeSafe also argued at trial that InterNACHI and Gromicko misrepresented their plan regarding the change in the application process. This fails to meet the first element of negligent misrepresentation, as it does not concern past or presently existing facts. Moreover, whatever InterNACHI or Gromicko *intended* to do with the IR application is irrelevant to a claim of negligent misrepresentation.

¶73. Unlike the defendants in *Posey*, InterNACHI did not move for summary judgment or a directed verdict on the issue of negligent misrepresentation. InterNACHI did, however, at

the conclusion of trial request that the trial judge set aside the jury's finding on the issue. Regardless of the procedural difference, the basic tenet from *Posey* applies here: a claim for negligent misrepresentation cannot be based on opinions or promises of future conduct. It is evident from the record that Gromicko made a lot of promises on behalf of InterNACHI. What HomeSafe failed to show, however, is that Gromicko misrepresented any past or present facts.

¶74. Given that HomeSafe failed to prove the first element of negligent misrepresentation—misrepresentation of a fact—we find that the trial court erred in denying InterNACHI's motion for judgment notwithstanding the verdict on this claim. Therefore, we reverse and render the finding of liability for negligent misrepresentation.

**CONCLUSION**

¶75. Given that HomeSafe had been successfully reinstated as an active corporation by the Secretary of State by the time it filed its amended complaint, we find the company had standing to pursue its lawsuit against InterNACHI. InterNACHI did not challenge the jury's conclusion that it had breached its contract with HomeSafe and converted the company's property; as a result, the jury verdict stands on these claims. However, because the damages for breach of contract were too speculative to sustain the jury's award of damages, we reverse and remand for a determination of nominal damages. Likewise, because the damages for conversion were not proved with reasonable certainty, we reverse and remand for a determination of nominal damages. After a review of the testimony and evidence in this case, we find that HomeSafe failed to prove a necessary element of negligent

27

misrepresentation; accordingly, we reverse and render the verdict on this claim.

¶76.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**